## UNITED STATES v. BUTTE, A. & P. RY. CO.
### No. 527.

District Court, D. Montana, Butte Division.
Feb. 26, 1930.

872

Wellington D. Rankin, U. S. Atty., of Helena, Mont.

L. O. Evans, D. M. Kelly, and John A. Groeneveld, all of Butte, Mont., and Warren Nichols, of Chicago, Ill., for defendant.

BOURQUIN, District Judge.

Upon this demurrer to the complaint to recover money alleged to have been paid by mistake the issues are the proper construction of the phrase, "which sustained a deficit in its railway operating income," in paragraph (a), § 204 (title 49 USCA § 73(a), the Transportation Act of 1920, and the effect of the Interstate Commerce Commission's decisions, infra. It appears that at all material times defendant operated a railroad as a common carrier, which during its period of federal control connected with a railroad under such control.

In those halcyon days when "he kept us out of war," defendant's road earned a substantial net railway operating income. Came an election won, entry into the war, federal control, and of defendant's road, release of it to defendant which operated it the remainder of the period of such control, and a net railway operating income, but less than before control or during the "test period" in paragraph (a) defined.

Followed the Transportation Act of 1920, the Interstate Commerce Commission's construction of the mooted phrase aforesaid to import a red ink balance, self-reversal to import mere decrease of income whether or not in the red, defendant's claim for reimbursement on account of its decrease aforesaid, the commission's certification of it in amount $487,116.31, payment by plaintiff, again the commission's reversal of self to again construe said phrase to intend a red balance, its rehearing and rejection of defendant's claim, plaintiff's demand for reimbursement by defendant refused, and this action.

The commission's decisions aforesaid, scanned, indicate changes in its personnel may operate much as in appellate courts.

From any decision herein, appeal is certain and justifies brevity.

The Federal Control Act (40 Stat. 451) guaranteed all roads controlled compensation equivalent to their average annual operating income during the three years ending June 30, 1917, the "test period" aforesaid. Any excess operating income vested in the United States. Roads not taken under control or from control released shifted for themselves as before control—entitled to all their income, but no more, be it more or less than the test period income. The Transportation Act terminating control, amongst other things, guaranteed to roads under control an operating income for the ensuing six months equal to their compensation under control, plus certain sums for additions, betterments, and extensions, by the carrier made; and, to roads circumstanced as defendant's, an operating income equivalent to that of the test period, plus the like certain sums awarded the controlled carriers as aforesaid, any excess income to be paid to the United States. In these provisions for carriers like defendant's occurs the phrase about which revolves the case at bar. It also occurs repeatedly elsewhere in the Transportation Act. And it is conceded (even by defendant, save in respect to paragraph [a]) that always it imports a red ink balance, not a mere decrease in operating income, but income less than outlay. Evidently, the Transportation Act designed that the controlled roads should fare as well in the guaranty period as during control, and the roads like defendant's, as well as in the test period. To these latter roads the act extended further benefits, to the extent that, if any such carrier "sustained a deficit in its railway operating income for that portion (as a whole) of the period of Federal Control during which it operated its own railroad," the Interstate Commerce Commission "shall ascertain for every carrier" its "deficit in railway operating income, if any, and its railway operating income, if any" for every month of the carrier's operation during the period of federal control, and the like derived from averaging the three corresponding months of the test period; that to the carrier will be credited any difference between results for corresponding months which are to the advantage of the test period, and to the United States, any like differences to the advantage of the control period; and that, to the extent that the sum of the former exceeds that of the latter, the commission shall certify it to the Secretary of the Treasury, whose warrant therefor shall be paid to the

carrier. See paragraphs (b–g), § 204 (Title 49 USCA § 73(b–g).

Thus paragraph (a) defines a general class of roads which may be entitled to indemnity, and paragraphs (b–f), the computations by which any particular road so entitled is identified and the amount of indemnity ascertained. The first is the grant and principal, the last is the means of identification of the grantee and subsidiary. In its interpretation of "deficit in its railway operating income" in paragraph (a), as importing mere decrease of income and not an excess of outlay over income or a red balance, the Interstate Commerce Commission recognized it was departing from the clear import of the same term repeatedly elsewhere appearing in the act. This it sought to justify by considerations of otherwise disparity, inequity, hardship, injustice, and absurdity, and of history, object, committee reports, etc.

For this construction on like reasoning defendant contends.

The argument may demonstrate that in the particular roads to be indemnified Congress ought to have included defendant's and its like, but it fails to persuade that Congress did.

█ It may be that the term in paragraph (a), "deficit in its railway operating income," is inaccurate to express the idea of outlay exceeding income or a red balance; but, Congress having so used it some half-score other places in the act, must be taken to have likewise used it in paragraph (a), no different intent clearly appearing. In the matter of grants of public property, any and all doubts are resolved against the grantees. Those who claim to be of the class of beneficiaries must find their warrant in express language of the granting act, and not at all in strained, ingenious, and unusual interpretations and inferences. Had Congress intended to include roads circumstanced as defendants, it could have plainly said so and did not. Moreover, to include the latter roads, the mooted term in paragraph (a) is wholly unnecessary and superfluous. Omit it, and they are included. On the contrary Congress therein stipulated none shall enjoy the bounty conferred save those sustaining a "deficit"; and since its only concern and prime object was successful *operation* of roads, it provided that the deficit need appear only in "railway operating income" whether or not was a deficit in the income as a whole and which might include much from land grants, mines, investments, and what not. Hence, the reason for the words descriptive of the deficit, whether or not inaccurate. They distinguish the one variety of income from the other, and are words of restriction. Without them, the word "deficit" would clearly import a red ink balance in the *entire* income; with them, it imports a red ink balance limited to part of the entire income, viz., the "railway *operating* income." And thus did Congress intend.

The House committee report on the Transportation Act is likewise persuasive, in that, referring to "deficit in railway operating income," it states that roads sustaining it "shall be paid the amount by which such deficit exceeds the corresponding deficit during the test period," the amount payable determined by comparing "deficit or income during" the control period with the like in the test period. If deficit means decrease in control period income compared with test period income, it must mean decrease in test period income compared with no standard prescribed. Obviously by "deficit" red ink balances alone make sense and are thus intended.

In so far as it is argued otherwise, for that every month of both control and test period might return a net income, though the former less than the latter, and that any the said differences by (2) paragraph (d) are to be credited to the carrier and by paragraph (f) and (g) ordered to the carrier paid, the answer is any such contingency would disclose the carrier not within the class of beneficiaries by paragraph (a) defined; that (2) paragraph (d) is subsidiary to and cannot extend the granting clause, paragraph (a), but with (1), (2), and paragraph (e) serves only for identification and computation; and that it yields to the granting clause and the intent of the statute as a whole. Those excluded from the grant of indemnity who with propriety might have been included have no judicial remedy. From any disparity, inequity, hardship, injustice flowing from the granting act, Congress alone can relieve, and to it any appeal must be made. Its discretion controls in respect to public grants by it made. If anything, contra, in U. S. v. Interstate Commerce Commission, 56 App. D. C. 168, 11 F.(2d) 554, it is not apparent in the report. The notable feature seems to be that the court, disclaiming jurisdiction, lectured the commission on the law, for which no doubt the commission is duly grateful.

█ Defendant further contends that the allowance and certification of its claim by the Interstate Commerce Commission was final and conclusive, that it could not reopen the matter, and that its original certification and payment made are a bar to this action. Many

cases are by it cited to the point that, where Congress has created a new right and remedy, the decision of any special tribunal provided to vindicate the one and to supply the other is final and beyond judicial review, if none has been by Congress authorized. Without review of the citations or attempt to reconcile the irreconcilable, it is believed the instant case comes within the principle that, if the special tribunal's decision involves no dispute of fact, and is inspired by and rests upon sheer erroneous construction of the statute, it exceeds this tribunal's authority, and the government can maintain an action at law to recover any money paid by reason of the mistake—an action not necessarily to review and annul the decision, not mandamus to control discretion, but only to deprive of the benefit of the erroneous decision, to compel the beneficiary to restore what he received, to which he has no right or title, and which in sound morals and good conscience he ought to return. See Talcott v. U. S. (C. C. A.) 23 F.(2d) 901, and citations. Moreover, the commission in this case was not a special tribunal, but a mere auditor in respect to carriers within the statute, to compute and certify the result from the commission's records and the carrier's reports to it, though doubtless it could receive other evidence. See Great Northern Ry. Co. v. U. S., 277 U. S. 180, 48 S. Ct. 466, 72 L. Ed. 838.

Demurrer overruled.